UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   21-873 (RC) |
| | : | |
| v. | : | Re Document No.:   41 |
| | : | |
| ILLUMINA, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM OPINION

GRANTING DEFENDANT'S MOTION TO TRANSFER VENUE

### I.  INTRODUCTION

Two biotechnology firms agreed that one would acquire the other.  The federal government then filed suit to stop the merger, arguing that the deal would stifle innovation and harm consumers.  But before any court can decide whether the merger can go forward, this Court must determine where the litigation should take place.  Between this district and a district that would be easier for the most witnesses to get to, the latter is more appropriate.

### II.  BACKGROUND

Illumina, Inc. is a market leader in genetic sequencing products.  Redacted Compl. ¶¶ 5–6, ECF No. 14.  Its sequencing platforms are a key component in multi-cancer early detection tests, which promise to revolutionize cancer treatment.  *Id.* ¶¶ 2, 6.  These tests will allow healthcare providers to screen for a wide variety of cancers and detect cancer early on in a tumor's development.  *Id.* ¶¶ 2–3.  Several biotechnology firms are racing to develop the technology and bring it to market.  *Id.* ¶ 4.

In 2015, Illumina formed GRAIL, Inc. to compete in that race. *Id.* ¶ 7. Two years later, however, Illumina reduced its share in GRAIL to below 20%. *Id.* ¶ 8. It currently owns just 14.5% of GRAIL's voting shares, with well-known investors like Jeff Bezos, Bill Gates, and Johnson & Johnson owning the rest. *Id.* GRAIL has now developed a multi-cancer early detection test called "Galleri." *Id.* ¶¶ 4, 9. It plans to seek approval to commercialize Galleri from the U.S. Food and Drug Administration ("FDA"). *Id.* ¶ 9. Last year, Illumina and GRAIL (collectively, "Defendants") entered into a merger agreement whereby Illumina would acquire the remaining 85.5% of GRAIL's shares it does not already own. *Id.* ¶ 26.

Concerned that the merger would have serious anticompetitive effects on the U.S. multi-cancer early detection test market, *see id.* ¶¶ 1, 11–14, the Federal Trade Commission decided to conduct an administrative adjudication to determine if the deal would violate federal antitrust laws, *id.* ¶ 27. That adjudication is scheduled to begin in the District of Columbia on August 24, 2021. *See id.*; Pl.'s Mem. Opp'n Defs.' Mot. Transfer Venue ("Pl.'s Opp'n") at 11, ECF No. 55. To prevent Defendants from executing the merger while the adjudication is pending, the Commission filed this action. *See* Pl.'s Mot. TRO, ECF No. 4. The parties have stipulated to a temporary restraining order that prevents the merger until the earliest of (1) September 20, 2021; (2) the end of the second business day after a court rules on the Commission's motion for a preliminary injunction; or (3) the Commission's dismissal of the action. TRO at 2, ECF No. 8.

The dispute at issue now is which court should decide the Commission's preliminary injunction motion. Defendants ask that the case be transferred to the Southern District of California. *See* Mem. P & A Supp. Defs.' Mot. Transfer Venue ("Defs.' Mot."), ECF No. 41-1. Both companies are headquartered in California—Illumina in the Southern District, Schwillinksi Decl. ¶ 4, ECF No. 41-3, and GRAIL in the Northern District, Song Decl. ¶ 3, ECF No. 41-2.

California was also the site of the merger negotiations. Schwillinksi Decl. ¶ 5; Song Decl. ¶ 6. And Defendants say that, if an in-person hearing on the motion is possible, more witnesses would have an easier time getting to the Southern District than this one. Defs.' Mot. at 1–2. The Commission opposes transfer. *See* Pl.'s Opp'n. It stresses that its choice of forum deserves considerable deference. *Id.* at 1. And it disputes Defendants' claim that the Southern District would be more convenient. *Id.* at 2. Ultimately, Defendants have the better argument.

### III. LEGAL STANDARD

Even when venue is already proper, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Assessing a transfer request requires an "individualized, case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964). The party who asks for a transfer bears the burden of showing it is warranted. *Chauhan v. Napolitano*, 746 F. Supp. 2d 99, 102 (D.D.C. 2010). First, the movant must demonstrate that venue would be proper in the proposed transferee district. *Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 330 (D.D.C. 2020). Second, the movant must show that the balance of private and public interests weighs in favor of transfer. *Id.*

### IV. ANALYSIS

The Commission does not disagree that venue would be proper in the Southern District of California. Nor could it, seeing as Illumina is headquartered there and GRAIL is headquartered elsewhere in California. *See* 28 U.S.C. § 1391(b)(1) (stating that venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"); *see also* 15 U.S.C. § 53(b) (permitting the Commission to bring suit, *inter*

*alia*, wherever venue is proper under section 1391). As a result, this dispute centers on whether private and public interests warrant transfer.

Almost all those factors are neutral or favor transfer. But the one factor weighing in favor of keeping the case is ordinarily entitled to a great deal of deference. Although the question is a close call, the Court agrees with Defendants that transfer is appropriate.

### A. The Effect of the COVID-19 Pandemic

Before delving into an assessment of the private and public interest factors, the Court addresses how the ongoing COVID-19 pandemic affects its analysis. For over a year, courts across the country—including this one and the District Court for the Southern District of California—have held limited in-person hearings to slow the spread of the COVID-19 virus. *See, e.g.*, Standing Order 20-9 (D.D.C. Mar. 16, 2020); Standing Order 18-A (S.D. Cal. Mar. 23, 2020). In the meantime, courts have mostly resorted to holding hearings over the telephone and videoconferencing software. But the proliferation of vaccines raises the possibility of returning to regular in-person proceedings soon. *See COVID-19 Vaccinations in the United States*, Ctr. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#vaccinations (showing that, as of April 18, 2021, 25.4% of the U.S. population was fully vaccinated).

The parties spar over how the possibility of an in-person preliminary injunction hearing impacts the appropriateness of transfer. Defendants want the hearing—which they say "will function as a trial on the merits"—to be in person. Defs.' Mot. at 1. And if the hearing is in person, they say, then it would be much easier for witnesses and parties who largely reside in California and the Western United States to travel to the Southern District than it would be for them to travel to the District of Columbia. *Id.* at 1, 7. Defendants assert that the risk of contracting COVID-19 may dissuade West Coast witnesses' attendance at a hearing on the other

4

side of the country, and they point out that local D.C. travel restrictions (such as testing and isolation requirements) would raise logistical hurdles. *See id.* at 7–8; *see also, e.g.*, D.C. Health, *Coronavirus 2019 (COVID-19): Guidance for Travel* (Mar. 3, 2021), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/attachments/Travel_Guidance_DCHealth_COVID-19_Updated%203.3.21.pdf. According to Defendants, relocating the case to the Southern District would minimize these burdens.

The Commission responds that an in-person proceeding is unnecessary, so none of Defendants' claimed burdens should hold weight. *See* Pl.'s Opp'n at 6–8. It points to cases where other district courts found that videoconference platforms permitted adequate assessment of remote witnesses' credibility. *Id.* at 6 (citing *Flores v. Town of Islip*, No. 18-cv-3549, 2020 WL 5211052, at *2 (E.D.N.Y. Sept. 1, 2020); *Raffel Sys., LLC v. Man Wah Holdings Ltd., Inc.*, No. 18-cv-1765, 2020 WL 8771481, at *3 (E.D. Wis. Nov. 13, 2020)). Given the effectiveness of remote proceedings, the Commission argues, there is no point in risking participants' health with an in-person hearing—especially in light of concerns that a fourth surge in COVID-19 cases may be coming or that variants of the virus may stall recent progress. *See* Pl.'s Opp'n at 7–8.[1] If the hearing will be remote anyway, the Commission concludes, then transferring the case would do little for the convenience of the parties or witnesses. *See id.* at 7.

Yet significantly, "[l]ive testimony is . . . markedly preferable" to remote testimony. *Beall v. Edwards Lifesciences LLC*, 310 F. Supp. 3d 97, 106 (D.D.C. 2018) (quoting *Pyrocap Int'l Corp. v. Ford Motor Co.*, 259 F. Supp. 2d 92, 98 (D.D.C. 2003)); *see also United States v.*

---

[1] *See also* Reis Thebault, *Are We Entering a 'Fourth Wave' of the Pandemic? Experts Disagree.*, Wash. Post (Apr. 4, 2021), https://www.washingtonpost.com/health/2021/04/04/covid-fourth-wave/; Apoorva Mandavilli & Benjamin Mueller, *Virus Variants Threaten to Draw Out the Pandemic, Scientists Say*, N.Y. Times (Apr. 5, 2021), https://www.nytimes.com/2021/04/03/health/coronavirus-variants-vaccines.html.

*Lattimore*, No. 20-cv-123, 2021 WL 860234, at *7 (D.D.C. Mar. 8, 2021) ("The Court would greatly prefer to hold all pre-trial hearings in person. . . . Unfortunately, the COVID-19 pandemic simply prevents the Court from holding in-person hearings safely at this time."). The utility of live proceedings is not limited to aiding in the evaluation of witness credibility—though that is one important benefit, *see Beall*, 310 F. Supp. 3d at 106; *Pyrocap*, 259 F. Supp. 2d at 98. Among other advantages, live proceedings permit more natural dialogue among hearing participants, allow participants to handle any physical evidence, and avoid the technical difficulties that can sometimes trip up virtual proceedings. The Court will therefore seek to maximize the chances that the preliminary injunction hearing can occur in person or, in the event of a hybrid proceeding, that as many people as possible can safely provide live testimony.

Due to the continued rollout of vaccines, an in-person or hybrid proceeding may be possible by July or August, which is when the parties anticipate the hearing taking place. *See* Sheryl Gay Stolberg, *Biden Moves Up Vaccine Eligibility Deadline for All Adults to April 19*, N.Y. Times (Apr. 6, 2021), https://www.nytimes.com/2021/04/06/us/politics/biden-vaccine-all-adults-eligible.html. But between the spread of virus variants, the possibility of another surge, and regional differences in vaccination rates, there is no way to predict whether a live hearing is more likely in one district versus the other. As a result, the relative likelihood of an in-person hearing between the two districts will not factor into the Court's analysis.

Nevertheless, the Court will assume in its assessment that the hearing will occur, at least in part, in person. *Cf. Montgomery v. Barr*, No. 20-cv-03214, 2020 WL 6939808, at *9 (D.D.C. Nov. 25, 2020) ("[T]his factor, as well as some others geared towards convenience, seems less relevant today because of the frequency of telephone and video conferences due to the COVID-19 pandemic. Even so, the Court must apply the legal framework, which envisions in-person

hearings and trials, as it exists. To do otherwise would eviscerate the idea that local courts should hear local matters." (citation omitted)). If that assumption turns out to be wrong, then—as the Commission points out—it matters little for convenience's sake which court hears the case. Either way, witnesses, lawyers, and the parties will be able to join the videoconference proceedings from the safety of their homes and offices. But if the hearing will be in person, then pandemic-related risks and restrictions could significantly impact participants' ability and willingness to attend. It is safer to plan for an in-person hearing so that, in case one does occur, as many participants as possible can safely appear.

### B. The Private Interest Factors Support Transfer

When weighing a motion to transfer, a court takes into account the following private interest considerations: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) the location where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) ease of access to sources of proof. *Vasser v. McDonald*, 72 F. Supp. 3d 269, 282 (D.D.C. 2014). Only one private interest factor—the plaintiff's choice of forum—favors this Court retaining the case. The remaining factors range from having a neutral effect on the venue analysis to strongly favoring transfer. Those factors win out.

Because the last four factors help assess the weight the first two are entitled to, the Court begins with them. For starters, the location where the claim arose benefits Defendants. A claim originates "in the location where the corporate decisions underlying those claims were made or where most of the significant events giving rise to the claims occurred." *Beall*, 310 F. Supp. 3d at 104 (citation omitted). Defendants emphasize that their officers negotiated the acquisition agreement in California. Song Decl. ¶ 6; Schwillinski Decl. ¶ 5. Although they do not specify that the negotiations took place in the Southern District, they are adamant that the negotiations

did not touch the District of Columbia at all. Song Decl. ¶ 6; Schwillinksi Decl. ¶ 5. At a minimum, then, the location where the claim arose is a neutral factor. *Cf. United States v. Energy Sols., Inc.*, No. 16-cv-1056, 2016 WL 7387069, at *4 (D. Del. Dec. 21, 2016) (explaining that the factor was "largely neutral" when the record was unclear and did not "definitively indicate" that merger negotiations took place in the proposed transferee district). But even if the negotiations occurred, say, in the Northern District of California, that district is much closer to the Southern District than this one. So to the extent that the factor is "a proxy for where the witnesses, parties, and evidence are likely to be located," *United States v. H & R Block, Inc.*, 789 F. Supp. 2d 74, 80 (D.D.C. 2011), the Southern District would likely provide a more convenient forum for this dispute than one across the country. *Cf. FTC v. Graco Inc.*, No. 11-cv-2239, 2012 WL 3584683, at *5 (D.D.C. Jan. 26, 2012) (determining that the factor favored transfer when the merger agreement "was negotiated, drafted, and executed" in the proposed transferee district). Indeed, the Court's analysis of the other factors bears that hypothesis out.

      The convenience-of-the-parties factor is neutral. For a "burden suffered by a party from litigating in a particular forum to weigh in favor of transfer, litigating in the transferee district must not merely shift inconvenience to the non-moving party; instead, it should lead to increased convenience overall." *Mazzarino v. Prudential Ins. Co. of Am.*, 955 F. Supp. 2d 24, 31 (D.D.C. 2013). Defendants' potential benefit from transfer is obvious. Illumina is headquartered in the Southern District. *See* Schwillinski Decl. ¶ 4; *see also Virts v. Prudential Life Ins. Co. of Am.*, 950 F. Supp. 2d 101, 107 (D.D.C. 2013) (explaining that a company's headquarters in a district made that forum a more convenient one). And GRAIL is headquartered in the Northern District of California, which is much closer to the Southern District than the District of Columbia. *See* Song Decl. ¶ 3. But because transfer would take the case away from where the Commission is

headquartered, it would merely shift inconvenience to the Commission. As a result, the factor favors neither party. *See Graco*, 2012 WL 3584683, at *6 (finding that convenience of the parties did "not weigh in favor of either party" because "Minnesota is more convenient for the defendants and the District of Columbia is more convenient for the FTC").[2]

Weighing heavily toward transfer is the convenience of witnesses. This factor is the most important one. *Beall*, 310 F. Supp. 3d at 105 ("The most critical factor to examine under 28 U.S.C. § 1404(a) is the convenience of the witnesses." (citation omitted)). Significantly, the inquiry is "not whether certain witnesses may be located outside the chosen forum, but instead whether those witnesses would be unwilling to testify in the District of Columbia." *FTC v. Cephalon, Inc.*, 551 F. Supp. 2d 21, 28 (D.D.C. 2008) (internal quotation marks and citation omitted). And because parties can typically compel their employees to appear regardless of the forum, the convenience of nonparty witnesses matters more than the convenience of party witnesses. *See H & R Block*, 789 F. Supp. 2d at 82; *see also Cephalon*, 551 F. Supp. 2d at 28 ("The employee witnesses located at Cephalon's headquarters are under the control of Cephalon and could most likely be compelled to testify here.").

Defendants' argument on this factor is strong. By their count, eleven of the nineteen third-party witnesses that the Commission has deposed or examined via investigational hearings "appear to be based in California." Mot. Hr'g Tr. at 13:14–15. And of the fourteen Illumina and GRAIL employees the Commission examined, thirteen live in California. *Id.* at 13:11–12. In addition, Defendants' competitors—which, both parties agree, will supply some witnesses—are

---

[2] The Commission mentions that the Southern District would require more lawyers to travel. *See, e.g.*, Pl.'s Opp'n at 7–8. But "[t]he location of counsel 'carries little, if any, weight in an analysis under § 1404(a).'" *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 n.7 (D.D.C. 2000) (citation omitted).

9

largely based in California and the Western United States. Of the competitors the Commission lists in its sealed complaint, more are headquartered in California than any other state or the East Coast as a whole, others have offices in California, and another has offices in nearby Arizona. *See* Sealed Compl. ¶ 46, ECF No. 3; *see also* Pl's. Opp'n at 18; Mot. Hr'g Tr. at 26:4–6 (Commission attorney stating that "potential witnesses" live in California, Arizona, Maryland, Massachusetts, and the District of Columbia). The Commission points out that the third-party witnesses' geographic distribution remains to be seen because the parties have not yet identified them for the hearing. Pl.'s Opp'n at 18. It also suggests that, while some potential witnesses' employers are in California, the witnesses live elsewhere. Mot. Hr'g Tr. at 25:23–25. Ultimately, however, the Commission does not offer any hard figures to dispute the general point that likely witnesses would have an easier time getting to the Southern District than this district.

Travel that would ordinarily pose a mere inconvenience may well, under the current circumstances, deter witnesses from attending proceedings in the case. "[T]he pandemic has highlighted that there can be risks associated with travel," so "[s]ome people who would not have been worried about travel before the pandemic are now reluctant to travel." *Express Mobile, Inc. v. Web.com Grp., Inc.*, No. 19-cv-1936, 2020 WL 3971776, at *4 (D. Del. July 14, 2020). Furthermore, witnesses may be less willing to attend proceedings if it means elongating their stay to account for local COVID-19 travel protocols such as testing and quarantining.

Given that more potential witnesses appear to be located in or near California than anywhere else, transferring proceedings in the Southern District would minimize the burdens and risks of travel for the greatest number of witnesses. *Cf. id.* at *3 (finding that the convenience of the witnesses "favor[ed] transfer" in part because "the bulk of non-expert witnesses are more likely to reside in the Middle District of Florida than anywhere else"). Even if many of the

witnesses live in other districts in the Western United States, holding proceedings in the Southern District would still reduce the need for potentially hazardous long-haul airplane trips. *See Safer Travel Ideas*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-risk.html (warning travelers to avoid long flights with layovers). Indeed, "[c]ourts have consistently transferred actions when the majority of witnesses live *near* the transferee forum." *Beall*, 310 F. Supp. 3d at 105 (alteration in original) (emphasis added) (quoting *Mathis v. Geo Grp., Inc.*, 535 F. Supp. 2d 83, 87 (D.D.C. 2008)). In sum, the critical convenience-of-the-witnesses factor strongly favors transfer.

The Southern District also provides easier access to some sources of proof, though the factor carries limited weight. Between housing Illumina's headquarters and its relatively close proximity to GRAIL's headquarters in the Bay Area, the Southern District has a geographic advantage over this district when it comes to obtaining corporate records about the merger. That said, modern technology permitting the instantaneous transfer of those kinds of records nearly eliminates that advantage. *See H & R Block*, 789 F. Supp. 2d at 83. *But see Beall*, 310 F. Supp. 3d at 106 ("While the records may be in electronic form, this factor weighs nonetheless in favor of transfer because 'all of the . . . documents' are located in the transferee forum." (citation omitted)). More important is the Southern District's proximity to physical exhibits such as company equipment and products, which Defendants remarked in oral argument would help a court decide the case. *See* Mot. Hr'g Tr. at 20:3–9. Because Defendants failed to raise that argument in their brief, *see* Defs.' Mot. at 11, the Court is hesitant to put too much stock in it, *see Walker v. Pharm. Rsch. & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006) (explaining that a party forfeits an argument not raised in its opening brief). Nevertheless, the Southern District appears marginally better poised to access relevant evidence than this Court.

What remains to be considered are the parties' preferences. Usually, a plaintiff's choice of forum is "a 'paramount consideration' that is entitled to 'great deference' in the transfer inquiry." *Cephalon*, 551 F. Supp. 2d at 26 (quoting *Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 31 (D.D.C. 2002)). Indeed, "some courts have found that the government's choice of venue in an antitrust case is 'entitled to heightened respect.'" *Id.* (quoting *United States v. Brown Univ.*, 772 F. Supp. 241, 242 (E.D. Pa. 1991)); *see also United States v. Microsemi Corp.*, No. 08-cv-1311, 2009 WL 577491, at *7 (E.D. Va. Mar. 4, 2009) ("Where venue is proper, a plaintiffs [sic] choice of forum is entitled to substantial weight, particularly where the plaintiff's choice of forum is authorized by the more liberal antitrust venue provision."). But the deference owed to a plaintiff diminishes if "there is an insubstantial factual nexus between the case and the plaintiff's chosen forum." *Fed. Hous. Fin. Agency v. First Tenn. Bank Nat. Ass'n*, 856 F. Supp. 2d 186, 192 (D.D.C. 2012) (quoting *New Hope Power Co. v. U.S. Army Corps of Eng'rs*, 724 F. Supp. 2d 90, 95 (D.D.C. 2010)). And "when the weight of the plaintiff's choice is comparatively weak," the defendant's choice deserves greater consideration. *Mazzarino*, 955 F. Supp. 2d at 31 (quoting *Virts*, 950 F. Supp. 2d at 106).

This case has little connection to the District of Columbia. After all, it originated out of a merger that two California-based companies negotiated in California. *Cf. Cephalon, Inc.*, 551 F. Supp. 2d at 26 ("None of the negotiations that led to the settlement agreements at the heart of this controversy took place in, or were in any other way related to, the District."); *cf. also Bergmann v. U.S. Dep't of Transp.*, 710 F. Supp. 2d 65, 72 (D.D.C. 2010) ("Plaintiff's choice of forum is also entitled to less deference where, as here, the majority of operative facts took place outside the District of Columbia."). The Commission nevertheless insists that this case is tied to the District in several ways. It first asserts that the merger will cause nationwide harm that will

affect consumers in the District of Columbia. Pl.'s Opp'n at 10. It then infers that, because Defendants claim in their answer that the merger will help GRAIL obtain FDA approval for Galleri, that GRAIL's small, D.C.-based government-relations office will play a "notably outsized role . . . in a review of this merger." *Id.* at 10–11; *see also, e.g.*, Redacted Answer at 12, ECF No. 49. And finally, it says that the parallel administrative adjudication pending in the District of Columbia warrants keeping the cases in the same locale. Pl.'s Opp'n at 11.

Each of those attempts to demonstrate a meaningful connection to this forum falls flat. While D.C. residents may feel the anticompetitive effects of the merger, the nationwide impact makes this forum no different than any other. *Cf. FTC v. Acquinity Interactive, LLC*, No. 13-cv-5380, 2014 WL 37808, at *2 (N.D. Ill. Jan. 6, 2014) (concluding that the Commission's choice of forum was entitled to "less weight" than usual because "the only real connection between the lawsuit and this district is that some of the alleged consumer injury occurred here," but that "d[id] not differentiate this district from any other district in the country"); *cf. also Graco*, 2012 WL 3584683, at *5 (similar); *Cephalon*, 551 F. Supp. 2d at 27–28 (similar). Likewise, GRAIL's D.C. office is not as relevant as the Commission claims it is. The office has fewer than ten employees, Song Decl. ¶ 5, and it is focused on lobbying rather than securing regulatory approvals (which is handled out of the company's California headquarters), Mot. Hr'g Tr. at 7:14–22. *Cf. Cephalon*, 551 F. Supp. 2d at 26 (finding that a corporation's "very small public affairs office in the District of Columbia" did not create a meaningful connection to the District). The yet-to-begin administrative adjudication does not help the Commission either. Its claim that the proceeding connects this case to the District was unsupported by any legal authority. *See* Pl.'s Opp'n at 11; *cf. Graco*, 2012 WL 3584683, at *5 ("The FTC argues that because this case is [a] preliminary injunction proceeding in aid of an administrative proceeding currently pending in

13

the District of Columbia, this case, in a procedural sense, arises out of that administrative action. There is, however, no legal support provided for the plaintiff's proposition."). And "this Court has long recognized that mere involvement on the part of federal agencies, or some federal officials who are located in Washington, D.C. is not determinative of whether the plaintiffs' choice of forum in the District of Columbia receives deference." *First Tenn. Bank*, 856 F. Supp. 2d at 192 (cleaned up) (quoting *New Hope Power*, 724 F. Supp. 2d at 95–96).

To the extent the Commission suggests that the FDA approval process ties this case to this district because the agency is headquartered nearby in Maryland, it is wrong. *See* Mot. Hr'g Tr. at 27:18 to 28:1. Of course, one of the many reasons Defendants agreed to the merger is that they believe it will allow Illumina to help secure FDA approval for GRAIL's Galleri product. *See* Redacted Answer at 12. But a federal agency's general oversight of an industry does not link its home forum to every controversy that somehow relates to its regulatory processes. *See Bergmann*, 710 F. Supp. 2d at 73 ("While plaintiff argues that his claims 'arose principally at the headquarters offices of the Defendants in Washington, D.C.,' defendants persuasively counter that 'the only real connection [the] lawsuit has to the District of Columbia is that a federal agency headquartered here . . . is charged with generally regulating and overseeing the [administrative] process.'" (alterations and omissions in original) (citations omitted)). The FDA has not taken any specific action toward Defendants. Its regulatory regime was merely part of the backdrop that motivated the deal.

The *H & R Block* case that the Commission relies on dealt with an agency that played a much more direct role in prompting the challenged merger. There, the government alleged that a do-it-yourself tax preparation company negotiated the acquisition of a competitor to stop it from disrupting the industry. *See* 789 F. Supp. 2d at 77. One of the competitor's prominent moves

14

involved a public-private partnership between tax preparation companies and the D.C.-based Internal Revenue Service that let qualified taxpayers prepare and file their taxes for free. *Id.* The competitor introduced an offer through the partnership that was free to all U.S. taxpayers, forcing major players in the industry to follow suit. *Id.* The industry then lobbied for restricting the type and number of taxpayers that could receive the partnership's free services, which the IRS eventually did. *Id.* Because "facts underlying the complaint took place" in the District and IRS employees would likely be witnesses, the government asserted that its choice of forum was entitled to deference. *Id.* at 79. The court agreed. *Id.* at 79–80. But the factors that drove that decision are not present here. In *H & R Block*, the IRS had a direct hand in the events that led to the challenged transaction. It partnered with tax preparation companies and, in response to lobbying, reduced industry participants' ability to compete through that partnership. By contrast, the FDA's sole involvement in this case is that GRAIL will one day ask it to approve Galleri for sale. The agency plays just the passive, background role of industry regulator. Indeed, it is telling that no party has indicated that FDA employees will serve as witnesses. The FDA's approval process thus does not connect the case with this forum.

Having determined that this case lacks a meaningful connection to the District other than the fact that the Commission is located here, the Court will not defer to the Commission's choice of forum. *See First Tenn. Bank*, 856 F. Supp. 2d at 192. That means the Defendants' choice deserves greater weight. *See Mazzarino*, 955 F. Supp. 2d at 31. And because the only contrary factor is diminished, the private interest factors collectively weigh toward transfer.

### C. The Public Interest Factors Are Essentially Neutral

There are three public interest factors that courts typically consider when deciding a motion to transfer: (1) whether there is a local interest in making a local decision about a local

15

controversy; (2) the proposed transferee court's familiarity with the applicable law; and (3) the relative congestion of the transferor and transferee courts. *H & R Block*, 789 F. Supp. 2d at 83. Because these factors are basically neutral with only the local interest factor possibly favoring transfer, the Court will keep its discussion brief.

First, if there is any local interest in this lawsuit, it would support transferring the case to the Southern District. The Court has already explained how the case's origins in California favor transfer. *Cf. Graco*, 2012 WL 3584683, at *6 (finding that the local interest factor favored transfer because the challenged transaction was negotiated in the proposed district and one of the defendants was headquartered there). In addition, Illumina is headquartered in the Southern District, and a decision blocking or permitting the merger could affect the company's employees who live there. *Cf. Bader v. Air Line Pilots Ass'n, Int'l*, 63 F. Supp. 3d 29, 36 (D.D.C. 2014) (noting that there was "some local interest" in the proposed transferee district because a related organization was headquartered there and the case "could have some impact on its employees"); That said, no district has a peculiarly local interest in hosting a suit that alleges nationwide anticompetitive effects. *See H & R Block*, 789 F. Supp. 2d at 83 ("The local interest in making decisions regarding local controversies is a neutral factor here because, as defendants concede, this case has national economic significance and does not present an essentially local matter."); *Cephalon*, 551 F. Supp. 2d at 31 (explaining that the public interest factor had "little application" because the "use of reverse-payment settlements" was "not a local issue at all" but instead "a question that has nationwide significance"). Consequently, this factor gives little reason to transfer the case beyond those already discussed—if any.

Second, because "all federal courts are presumed to be equally familiar with the law governing federal statutory claims," neither district court enjoys an expertise-based advantage

over the other.  *See Mazzarino*, 955 F. Supp. 2d at 32 (quoting *Intrepid Potash–N.M., LLC v. U.S. Dep't of Interior*, 669 F. Supp. 2d 88, 98 (D.D.C. 2009)).  This factor is therefore neutral.

       Third, caseload statistics do not indicate that one forum would be able to dispose of the case more efficiently than the other.  While district judges in the Southern District have more cases (503 cases per judge) than those in the District of Columbia (373 cases per judge), the median time between the filing of a civil case and the case's disposition is nearly equal across the two districts (6.0 months in the Southern District versus 5.8 months in the District of Columbia).  Admin. Off. of U.S. Courts, *United States District Courts—National Judicial Caseload Profile* 2, 69 (Sept. 30, 2020), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf.  None of the parties try to tell a different story from those statistics.  *See* Defs.' Mot. at 11–12; Pl.'s Opp'n at 21.  Instead, the Commission suggests that, if the case is transferred, there could be delays as the new court gets up to speed.  Pl.'s Opp'n at 21.  But seeing no evidence that the Southern District courts are more backlogged than courts in this district, the Court doubts that any delay will be material.  Moreover, accepting the Commission's argument would give the initial court an automatic advantage in any transfer dispute.  As Defendants point out, a transferee court will always have to play catch-up when it receives a new case.  Mot. Hr'g Tr. at 18:17–22.  This factor is neutral too.

\*   \*   \*

       In the final calculation, only one factor favors this Court retaining the case: the Commission's choice of forum.  But because the case lacks a meaningful connection to the District of Columbia, that ordinarily important factor carries little weight.  The remaining factors are either neutral or support transfer.  Most significantly, transferring the case to the Southern District of California would be much more convenient for the bulk of the witnesses.  That

already substantial factor holds even greater force during the ongoing COVID-19 pandemic. The Court will therefore transfer the case.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Transfer (ECF No. 41) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: April 20, 2021                                                                  RUDOLPH CONTRERAS
                                                                                                       United States District Judge